## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NYRON PEART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-778-MN-JLH |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### REPORT AND RECOMMENDATION

Plaintiff Nyron Peart appeals from an unfavorable decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits ("DIB"). This Court has jurisdiction under 42 U.S.C. § 405(g).

The parties filed cross-motions for summary judgment. (D.I. 13; D.I. 19.) I recommend that the Court DENY Plaintiff's motion and GRANT the Commissioner's cross-motion, as I conclude that the Commissioner's decision is supported by substantial evidence and that there are no reversible errors.

### I. LEGAL STANDARDS

Courts review the Commissioner's factual findings for "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In reviewing whether substantial evidence supports the Commissioner's findings, courts may not "re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011); *see also Zirsnak v. Colvin*, 777 F.3d 607, 610–11 (3d Cir. 2014). In other

words, reviewing courts must affirm the Commissioner if substantial evidence supports the Commissioner's decision, even if they would have decided the case differently.

To determine if a claimant is disabled, the Commissioner follows a five-step sequential inquiry. *See* 20 C.F.R. § 416.920(a)(4)(i)–(v). The Third Circuit has previously explained this sequential analysis, and the shifting burdens that attend each step, in detail:

> The first two steps involve threshold determinations. In step one, the Commissioner must determine whether the claimant currently is engaging in substantial gainful activity. If a claimant is found to be engaging in substantial gainful activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant has a medically severe impairment or combination of impairments. If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If the impairment is equivalent to a listed impairment the disability claim is granted without further analysis. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work. The claimant bears the burden of demonstrating an inability to return to his past relevant work. If the claimant does not meet the burden the claim is denied.
>
> If the claimant is unable to resume his former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The Commissioner must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his or her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he is capable of performing work and is not disabled.

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545–46 (3d Cir. 2003) (internal citations omitted). The analysis is identical whether an application seeks disability insurance benefits or supplemental security income. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 n.3 (3d Cir. 2004).

## II. BACKGROUND

My Report and Recommendation was announced from the bench on October 27, 2023, as follows:

> I recommend that the Commissioner's motion for summary judgment be granted and that Mr. Peart's motion for summary judgment be denied.
>
> I will summarize the reasons for that recommendation in a moment, but before I do, I want to be clear that my failure to address a particular argument advanced by a party does not mean that I did not consider it. We've carefully considered the pertinent portions of the administrative record and the parties' briefs. I'm not going to read my understanding of the applicable law into the record today; however, we will incorporate the ruling I'm about to state into a separate written document, and we will include a summary of the applicable law in that document.
>
> At the time of the ALJ's decision, Plaintiff Nyron Peart was 42 years old. He previously worked as a program manager and inventory manager, but the record reflects that he was let go from that job in late 2018 or early 2019.[1] He has not worked since. He filed an application for disability benefits alleging that he has been disabled since January 26, 2019.[2]
>
> Mr. Peart has a complicated medical history, and the record reflects that he has a history of cysts, primarily on his scalp, going back to the early 2000s. Peart was ultimately diagnosed with a rare disorder called Rosai-Dorfman disease in 2020.[3]

---

[1] (Transcript of Social Security Proceedings, D.I. 10 ("Record" or "R."), at 21, 24, 501–02, 815.)

[2] (R. 13.)

[3] (R. 19.)

3

The ALJ who ruled on Peart's application for disability benefits found at step two that he had multiple severe impairments: Rosai-Dorfman disease, right retroperitoneal mass (i.e., a growth in the abdominal cavity), epidermal cysts, dissecting cellulitis of scalp, degenerative disc disease, obesity, post-traumatic stress disorder (or PTSD), and major depressive disorder.[4] The ALJ also found that Peart had non-severe impairments of COVID-19, diabetes mellitus, hypertension, gastritis, eczema, and asthma.[5]

At step three, the ALJ found that Peart's impairments did not meet the standards for a listed impairment. In regard to Peart's cysts, the ALJ found they did not meet the criteria of listings 8.04 or 8.05 "because they do not meet the definition of 'extensive skin lesions' as defined at Section 8.00C1."[6] The ALJ determined that the lesions were "primarily limited to the scalp and do not involve multiple body sites or critical body areas, such as the hands or feet."[7]

The ALJ also analyzed Peart's mental impairments at step three and determined that they did not meet or medically equal the criteria of listings 12.04 and 12.15.[8] The ALJ rated the degree of Peart's functional limitation in accordance with the four criteria commonly referred to as the "Paragraph B" criteria.[9] In order to satisfy Paragraph B to meet a 12.00 listing, Peart needed to have either one extreme limitation or two marked limitations.[10] The ALJ concluded that Peart had mild limitations in "understanding, remembering, or applying information" and in "interacting with others" and moderate limitations in regards to "concentrating,

---

[4] (R. 15.)

[5] (R. 15–16.)

[6] (R. at 16.)

[7] (R. 16.)

[8] (R. 16.)

[9] *See* 20 C.F.R. at 404.1520a(b)(2), (c)(3) ("We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."); see also 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00E.

[10] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00F.

persisting, or maintaining pace" and for "adapting or managing oneself," and, therefore, he did not meet the 12.00 listings.[11]

The ALJ found that Peart has the residual functional capacity or RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) except occasionally climb ramps and stairs; but never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; tolerate occasional exposure to extreme heat, extreme cold, humidity, wetness and vibrations. The claimant cannot tolerate exposure to hazards, such as moving machinery or unprotected heights; and can tolerate exposure to lights no brighter than a typical office setting level and noise no louder than a typical office setting level (moderate noise). The claimant is able to finger, handle and reach frequently; can remember, understand and carry out simple instructions; and can tolerate few changes in a routine work setting."[12]

The ALJ found at step four that, given that RFC, Peart could not perform his past relevant work.[13]

At step five, the ALJ found that, notwithstanding Peart's limitations, a person with his background and prior work experience could work as an order clerk, address clerk, or ampule sealer. Accordingly, the ALJ found that Peart was not disabled.[14]

I will now turn to Mr. Peart's arguments to this Court. Peart's first argument is that the ALJ at step three erred by misinterpreting what was required to meet listings 8.04 and 8.05.

The point of the listings is to have a way for the agency to identify those claimants whose impairments are so severe that the claimant would be unable to do "any gainful activity, regardless of his or her age, education, or work experience."[15] The skin listings have recently been amended, but at the time of the ALJ's decision, listing 8.04 required "[c]hronic infections of the skin or mucous membranes, with extensive fungating or extensive ulcerating skin

---

[11] (R. at 16–17.)

[12] (R. 17–18.)

[13] (R. 24.)

[14] (R. 25.)

[15] 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990).

lesions that persist for at least three months despite continuing treatment as prescribed." Listing 8.05 required "[d]ermatitis (for example, psoriasis, dyshidrosis, atopic dermatitis, exfoliative dermatitis, allergic contact dermatitis), with extensive skin lesions that persist for at least three months despite continuing treatment as prescribed."[16]

Both of those listings required "extensive skin lesions," which are explained in the regulations as follows:

> 1. Extensive skin lesions. Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:
> a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.
> b. Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.
> c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.[17]

The ALJ's determination that Mr. Peart did not have "extensive skin lesions" within the meaning of the listing is supported by substantial evidence. While the ALJ's discussion on this point is short, that is not surprising because the question is not even close. The record demonstrates, and the ALJ found, that Mr. Peart's lesions were "primarily" on his scalp.[18] While the record reflects that Mr. Peart at various points in time has had various lesions on other parts of his body, Peart hasn't directed the Court to evidence that his lesions on those parts were so severe as to very seriously limit his ability to use those body parts or otherwise very seriously limit his ability to function. Rather, as the Commissioner points out, the treatment records during the relevant period of Peart's claim suggest only isolated and non-severe incidences of cysts in areas other than the scalp.

---

[16] 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 8.04-05 (2021).

[17] 20 CFR Pt. 404, Subpt. P, App. 1, § 8.00C (2021).

[18] (R. 16.)

6

Peart suggests that the ALJ required him to show that he met one of the specific examples set forth in 8.00C, which Peart says was legal error. But I do not think that is what the ALJ did. Rather, the ALJ's decision reflects her appreciation of the fact that, to qualify as "extensive skin lesions," the lesions must in some way affect "a critical body area[]" that would impede functioning or "involve multiple body sites" in a way that results in a very serious limitation. Substantial evidence supports the ALJ's conclusions that Peart's lesions were "primarily" on his scalp and that he didn't have lesions in critical body areas that would limit the use of those body parts.[19] While the ALJ might have said more about why all of the lesions, taken together, didn't meet the listing, I don't think she needed to in light of the evidence of record. The record does discuss non-scalp lesions, but those instances appear to happen primarily outside of the relevant time period and to be limited in duration, nor has Peart adequately explained to this Court how his scalp and/or other lesions seriously limit his ability to function.

Peart next argues that the ALJ erred by failing to consider whether he met the listings under subsections 7.00, 13.00, or 14.00. However, Peart has failed to show "how further analysis could have affected the outcome of his disability claim."[20] Under ordinary harmless error review, which applies to administrative appeals, "appellant bears the burden to demonstrate harm."[21] Peart does not answer "*how* [he] might have prevailed at step three if the ALJ's analysis had been more thorough" and therefore he provides "no basis for [the Court] to remand the case to the ALJ."[22]

Peart next argues that the ALJ committed legal error by failing to "develop the medical evidence," which Peart said could have been done by obtaining testimony from a medical expert. I disagree that the ALJ committed legal error. Peart was represented at the ALJ level, and, while the ALJ is under a duty to develop the record to make a case for approving or denying benefits, the choice to obtain additional evidence from a medical expert is in the ALJ's

---

[19] (R. 16.)

[20] *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3rd Cir. 2016).

[21] *Id.*

[22] *Id.* (emphasis in original).

discretion.[23] With over 700 pages of medical transcripts and history, I cannot say that the ALJ did not have sufficient evidence to support her decision that Peart did not meet a listing.

Peart's next challenge to the ALJ's decision has to do with step four. He argues that the ALJ erred by failing to include limitations in the RFC related to his mental limitations stemming from his PTSD and depression. I reject Peart's argument that the ALJ erred at step four.

As an initial matter, no one here disputes that the ALJ was required at step four to consider all of Peart's impairments, even those that she found not to be severe.[24] The ALJ did that. Her lengthy step four analysis included a detailed discussion of Peart's physical limitations as well as his claimed mental limitations. In particular, the ALJ carefully analyzed evidence relevant to the imposition of limitations stemming from his PTSD and depression, including, for example, his ability to remember, his reasoning and judgment, his interactions with others, his ability to carry out detailed instructions, his ability to maintain attention and concentration, and even his ability to cope with production norms.[25] The ALJ also considered Peart's testimony that he has "some difficulty getting along with co-workers," and that he "reports difficulty completing tasks and has to write things down because he does not remember them," but she nevertheless found that his own "statements about the intensity, persistence, and limiting effects of his symptoms . . . are inconsistent with the evidence of record."[26] After the ALJ considered the evidence related to Peart's PTSD and depression in the RFC assessment, she found that Peart "is able to remember, understand, and carry out simple instructions, and can tolerate few changes in a routine work setting."[27]

---

[23] *See* 20 C.F.R. § 404.1513a(b)(2) ("Administrative law judges *may* also ask for medical evidence from expert medical sources." (emphasis added)).

[24] *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.7 (3d Cir. 2005) ("Although the impairment must be medically determinable, it need not be a 'severe' impairment to be considered in the RFC assessment."); *see also* 20 C.F.R. § 404.1523 ("[W]e will consider the combined effect of all of your impairments without regard to whether such impairment, if considered separately, would be of sufficient severity.").

[25] (R. 22–24.)

[26] (R. 22.)

[27] (R. 22.)

Peart's real argument appears to be that, once the ALJ found at step three that Peart had a "moderate" limitation with respect to the Paragraph B criterium of "concentrating, persisting, or maintaining pace" the ALJ was required to include something specific about that in the RFC. I reject that argument. For one thing, "unlike the findings at step[] . . . three, the RFC 'must be expressed in terms of work-related functions[,]' such as by describing the claimant's 'abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.'"[28] In other words, "the findings at step[] . . . three will not necessarily translate to the language used at steps four and five."[29]

To the extent Peart argues that the case should be remanded because the ALJ failed to provide an RFC limitation specific to pace, the caselaw does not agree. In fact, the Third Circuit has explained that "so long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'"[30] The ALJ's limitation of Peart to remembering, understanding and carrying out simple instructions and tolerating few changes in a work situation is equivalent, if not more limiting, than a "simple routine tasks" limitation. And the ALJ gave a valid explanation for those RFC limitations in her lengthy discussion of the evidence surrounding Peart's PTSD and depression, including that Peart's own "statements about the intensity, persistence, and limiting effects of his symptoms . . . are inconsistent with the evidence of record."[31]

---

[28] *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (citing SSR 96-8p, 61 Fed. Reg. 34474, 34476 (July 2, 1996)).

[29] *Id.*

[30] *Hess*, 931 F.3d at 211; *see also McDonald v. Astrue*, 293 F. App'x 941, 946 (3d Cir. 2008) (affirming ALJ that included "simple, routine tasks" limitation in light of "moderate limitations with [the claimant's] ability to maintain concentration, persistence and pace"); *Menkes v. Astrue*, 262 F. App'x 410, 412–13 (3d Cir. 2008) (affirming ALJ that "acknowledged that [the claimant] suffered moderate limitations in concentration, persistence and pace" and "accounted for these mental limitations in the hypothetical question by restricting the type of work to 'simple routine tasks'").

[31] (R. 22.)

9

    While it is possible that an ALJ's failure to consider a claimant's non-severe mental impairment at step four may constitute reversible error where the ALJ completely fails to consider limitations stemming from the non-severe impairment, that is not the case here. It is clear that the ALJ considered evidence of Peart's impairment of PTSD and depression at step four, and her decision not to include a pace limitation is supported in the RFC by substantial evidence in the record.

    Finally, Peart argues that the case should be remanded because the ALJ that heard it was illegally appointed. Specifically, Peart argues that Acting Commissioner Berryhill's tenure had expired under the FVRA when she ratified the ALJ's appointment in July 2018. Because the ALJ was not appointed by an agency head, Peart contends, the appointment violated the Appointments Clause of the Constitution. The majority of courts to have addressed that argument, including courts in this circuit, have rejected it, concluding that Ms. Berryhill was lawfully serving as Acting Commissioner when she ratified ALJ appointments in July 2018. I cited several such cases in my Report and Recommendation in *Gaspero v. Kijakazi,* [No. 22-86, 2022 WL 17830246, at *4 n.20 (D. Del. Dec. 21, 2022)], which was adopted by the district judge at 2023 WL 2734326, and I incorporate that discussion here by reference. Additionally, I note that the cases which Peart relies on to support his argument, *Brian T.D. v. Kijakazi*[32] and *Richard J.M. v. Kijakazi*[33] from the District of Minnesota have been overturned by the United States Court of Appeals for the Eighth Circuit in *Dahle v. Kijakazi*, [62 F.4th 424 (8th Cir. 2023)].

## III. CONCLUSION

For the reasons set forth above, I recommend that Plaintiff's motion for summary judgment (D.I. 13) be DENIED and the Commissioner's cross-motion (D.I. 19) be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to

---

[32] 2022 WL 179540 (D. Minn. Jan. 20, 2022).

[33] 2022 WL 959914 (D. Minn. Mar. 30, 2022).

10

ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: November 30, 2023

                                                                Honorable Jennifer L. Hall
                                                                 UNITED STATES MAGISTRATE JUDGE